1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ARNULFO RIVERA MEZA,                              No. C-09-1402-EDL

        Plaintiff,                              **ORDER DENYING PLAINTIFF'S**
                                                      **MOTION FOR SUMMARY JUDGMENT;**
  v.                              **GRANTING DEFENDANT'S CROSS-**
                                                      **MOTION FOR SUMMARY JUDGMENT**
MICHAEL J. ASTRUE, Commissioner of Social
Security.

        Defendant.
_____/

## I.    INTRODUCTION

      On March 31, 2009, Plaintiff Arnulfo Rivera Meza filed this suit pursuant to 42 U.S.C. §

405(g) seeking judicial review of a decision denying his claim for Disability Insurance Benefits

under Title II of the Social Security Act, 42 U.S.C. § 400 <u>et seq</u>.  On July 14, 2010, Plaintiff filed a

motion for summary judgment, asking the Court to reverse the final decision of the Commissioner

and find him "disabled" under the Social Security Act, or alternatively, remand the case for a new

hearing.  Defendant filed a cross-motion for summary judgment asking the Court to affirm the

Commissioner's final decision.  Plaintiff did not file a reply.  For the following reasons, the Court

DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for

summary judgment.

## II.    BACKGROUND

      Plaintiff Arnulfo Rivera Meza was born on May 25, 1964.  Administrative Record ("AR") 31.

He has a third grade education from Mexico and is illiterate in English.  AR 31-32.  Plaintiff

testified at his administrative hearing through an interpreter.  AR 28.  Plaintiff is a permanent

**United States District Court**
For the Northern District of California

resident of the United States, and for approximately nineteen years, 1980 through 1999, he worked in a clothing factory as a machine operator, dyeing fabric. AR 32. During his work at the clothing factory, Plaintiff engaged in heavy exertion and was involved with the handling of chemicals, including choral acid, peroxide, sodium acid, and Clorox. AR 32-33. His duties at the factory included pushing a cart with 500 to 600 pounds of wet clothing. AR 33.

In June of 1998, Plaintiff was injured in an accident at the factory. AR 35, 100. Plaintiff testified that he slipped on the floor and hit his chest against one of the machines. AR 35. Plaintiff testified that on the day of the accident, he "didn't feel anything," but "[t]he following day [he] couldn't get up." AR 35. As a result of this accident, Plaintiff stated that he could only work "off and on," and stopped all work on March 31, 1999. AR 35, 100. Plaintiff testified that he currently suffers from problems with his voice, as well as neck, back, and left arm pain, which prevent him from working. AR 34, 36. Plaintiff is right-handed, but testified that his right arm "gets really tired really quickly because of the lack of use of the other side." AR 34, 42.

Plaintiff stated that his disabilities include no use of his left arm, a hoarse voice, the inability to move sideways due to his back, the inability to sit or stand without frequently changing positions, and he is limited to lifting two or three pounds. AR 34-37. Plaintiff also testified that he is diabetic and on medications which make him sleepy. AR 37-38. Plaintiff claims that his impairments are primarily due to his accident at work, and his hoarseness is attributed to chemical exposure, although the exact cause of Plaintiff's impairments and exact beginning date of his symptoms are unclear from the record. AR 35; see Pl.'s Mot. at 1-2.

At the time of the hearing before the Administrative Law Judge ("ALJ") on January 28, 2008, Plaintiff testified that he was living with friends, and supporting himself by borrowing from friends. AR 38. Plaintiff stated that he sometimes performs chores such as taking out the trash or vacuuming, and occasionally borrows a car to drive if he is feeling "clearheaded." AR 39. Since he stopped working, Plaintiff testified that he has traveled to Mexico four times, with assistance from others, to visit his parents. AR 39.

Plaintiff made a workers' compensation claim after his workplace accident, but testified that as of January 28, 2008, it had "been five years since last [he] received any sort of money or medical

**United States District Court**
For the Northern District of California

attention," with the exception of medical attention from Dr. Lin.  AR 34.  Plaintiff originally applied for Social Security disability benefits on April 4, 2006.  AR 10.  The Social Security Administration ("SSA") denied Plaintiff's benefits application both initially (September 13, 2006)  and upon reconsideration (April 2, 2007).  AR 10.  Plaintiff requested a hearing, which was held on January 28, 2008, where Plaintiff waived his right to representation.  AR 10, 29.  The ALJ concluded that Plaintiff was not disabled from the day Plaintiff stopped working, March 31, 1999 through the date Plaintiff was last insured,  March 31, 2004.  AR 10.  On January 30, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  AR 1.

According to the record,[1] Plaintiff's first medical visit after his June 1998 accident was on August 13, 1998.  AR 228.  Plaintiff underwent a radiology scan which reflected the following impression: "1. Injuries of the anterior costochondral junctions of the right ninth, tenth and eleventh ribs.  2. Abnormal tracer activity of the most cephalad segment of the body of the sternum, clinical/radiographic correlation recommended."  AR 228.

Two years after the accident, in 2000, Plaintiff sought medical attention, primarily for his throat, pain in his upper left chest and arm, and his liver.  On April 13, 2000, the doctor determined that Plaintiff had chemically induced irritation of the voice box.  AR 211.  On April 14, 2000, Plaintiff sought medical care[2] for his hoarse voice.  AR 153.  The doctor noted that Plaintiff had a hoarse, dry voice and tenderness on the left side of his chest, and referred him to an ENT.  AR 153.  On May 3, 2000, an ENT examined Plaintiff, finding a hoarse voice with possible gastroesophageal reflux.  AR 160.  On May 25, 2000, Plaintiff underwent an exam detecting mild tenderness of the abdomen and "very reactive" deep tendon reflexes, as well as an assessment of chemical inflamation of the throat.  AR 210.  On May 31, 2000, Plaintiff followed up with the ENT, who found that

---

[1] As discussed further below, Plaintiff's motion alleges that there are medical reports missing from the record, but has not moved to supplement the record before this Court, or specified what he contends is missing.  See Pl.'s Mot. at 13-14.

[2] It is not clear if this was an emergency room visit.  However, it appears that Plaintiff did not receive any treatment at this visit, but was instead referred to an Ears, Nose and Throat Specialist.  This is consistent with the ALJ's finding that Plaintiff has never received any emergency room *treatment*.  See section IV, Final ALJ Decision, below.

3

Plaintiff had spasmodic dysphonia (a voice disorder), "but functional voice and no airway problems," prescribed new medication and referred Plaintiff to a GI [gastrointestinal specialist]. AR 159.

On June 26, 2000, Plaintiff was found to have possible chemical irritation of the voice box, and the doctor noted tenderness on the left side of Plaintiff's abdomen and that his liver function tests ("LFTs") were elevated. AR 207. On July 25, 2000, Plaintiff reported "[p]ain on and off" for over a year in his upper left chest and arm that increased with walking and decreased with resting. AR 205. The examining doctor noted that Plaintiff's "left shoulder [was] much higher than [his] right shoulder" and that Plaintiff was "very tender" in the left upper quadrant (chest and arm). AR 205.

Further, on August 21, 2000, Plaintiff was again found to have elevated LFTs and "trauma of left side of chest." AR 204. Plaintiff noted that the pain had decreased, but was still present. AR 204. On August 31, 2000, Plaintiff was determined to have muscle spasms of the pectoral muscles after reporting swelling of the chest. AR 203. It was noted that Plaintiff's left shoulder was higher than his right shoulder, and his chest muscles were "tight and tender." AR 203. On September 18, 2000, Plaintiff complained of chest swelling on the left side, and was once again assessed with elevated LFTs and trauma of the chest on the left side, as well as a "chronic cough." AR 202. On October 16, 2000, Plaintiff still had elevated LFTs and a chronic cough. AR 199. On November 16, 2000, Plaintiff's doctor noted that Plaintiff had possible anxiety, as well as elevated LFTs and abdominal pain. AR 197. On November 27, 2000, Plaintiff showed mild improvement in his muscle pain and anxiety, but his LFTs were still elevated. AR 196.

In 2001, Plaintiff went through another series of medical appointments. On January 3, 2001, Plaintiff reported that Zoloft was not helping his anxiety anymore, and was prescribed an increased dose of Zoloft and a refill of Naproxen. AR 195. Plaintiff was determined to have anxiety/depression and "trauma of left chest two years ago." AR 195. It was also noted that Plaintiff had decreased range of motion from his waist up. AR 195. On February 5, 2001, Plaintiff reported that Zoloft was helping more but his orthopedic appointment had to be rescheduled due to his elevated blood pressure. AR 193. Plaintiff was assessed with depression, high blood pressure, and work related injury. AR 193. On February 19, 2001, Plaintiff was noted to have a work related

4

injury and improved depression.  AR 192.  On April 26, 2001, Plaintiff presented a "cracked and squeaky" voice, decreased flexibility and tender paralumbar muscles.  AR 191.  Plaintiff was assessed with a history of work related back/chest/arm injury, history of high blood pressure, history of stomach bacteria, and a hoarse voice.  AR 190.

Further, on May 9, 2001, Plaintiff reported nervousness, trouble sleeping, and pain.  AR 189. Plaintiff was determined to have anxiety/depression, hand and back pain, and gastrointestinal distress.  AR 188.  Plaintiff was referred to orthopedics.  AR 188.  On June 12, 2001, Plaintiff underwent an orthopedic examination, and the examining doctor noted that his left shoulder was much higher than his right, he had a swollen left hand and an issue relating to his upper chest (doctor's notes undecipherable).  AR 314.  He was assessed with "possible torn pectoris muscle, [possible] cuff tear [left] shoulder," and an MRI was recommended.  AR 314.  On August 23, 2001, Plaintiff reported feeling the same and was determined to have chemical exposure, trauma of the chest and gastritis.  AR 187.  On September 27, 2001, Plaintiff reported pain in his chest muscles, with no change, and was assessed with trauma of chest.  On October 25, 2001, Doctor Williams noted that the orthopedist had requested an MRI of Plaintiff's shoulder, but Plaintiff was waiting for worker's compensation to pay for it.  AR 185.  On December 5, 2001, no change was noted in Plaintiff's condition.  AR 183.

There are no medical appointments during 2002 in the record, but there are two in 2003.  On February 5, 2003, Plaintiff sought treatment for an allergic reaction and his hands were observed "very red when hanging by body, usual color if lifted," and Plaintiff had decreased strength in "both thumbs and hands."  AR 181.  On March 19, 2003, Plaintiff reported having no health insurance and that he was anxious, which Zoloft helped.  AR 178.  Plaintiff reported being sleepy after taking medication, and there was no change in the redness of his hands.  AR 178.

After March 31, 2004, Plaintiff's date of last insurance ("DLI"), Plaintiff saw a doctor three times in 2004 with complaints and assessments similar to his previous visits.  AR 175, 173, 167. There are no reported medical visits from 2005.  On March 7, 2006, Plaintiff began seeing Dr. Lin, who reviewed two of Plaintiff's earlier medical reports and conducted an extensive exam.  AR 307-308.  Plaintiff continued to see Dr. Lin from 2006 to 2007.  AR 300, 287-289, 284, 279, 276-277,

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  273, 271, 268, 311-312.  Dr. Lin found that Plaintiff was still experiencing his previously-reported

2  symptoms, some of which were worsening, and Plaintiff showed decreased range of motion and

3  strength in his left arm.  AR 284, 279.  Plaintiff continued to take a variety of prescription

4  painkillers.  AR 276, 277.[3]

5         The Disability Determination Service ("DDS") physician, Dr. Dhaliwal, completed a residual

6  functional capacity assessment of Plaintiff on June 1, 2006.  AR 229-236.  Dr. Dhaliwal found that

7  Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, could stand/walk

8  for about six hours in an 8-hour workday, sit for six hours in an 8-hour workday, and was limited to

9  occasional pushing/pulling with his upper extremities.  AR 230.  Dr. Dhaliwal found no postural

10 limitations, and also found that Plaintiff had unlimited handling, fingering, and feeling abilities, but

11 was limited to only occasionally reaching overhead.  AR 231-232.  Dr. Dhaliwal concluded that

12 Plaintiff had a residual functional capacity for light work but was limited in reaching overhead with

13 his left arm.  AR 236.

14 **III.  STANDARD OF REVIEW**

15        Section 405(g) of the Social Security Act limits the Court's jurisdiction to determining whether

16 the findings of fact in the ALJ's decision are supported by substantial evidence or were premised on

17 legal error.  42 U.S.C. § 405(g); see Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).

18 Substantial evidence is defined as relevant evidence which a reasonable person might accept as

19 adequate in support of a conclusion; it is "more than a mere scintilla but less than a preponderance."

20 Id.; see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Sandgathe v. Chater, 108 F.3d 978,

21 980 (9th Cir. 1997).

22        To determine whether the ALJ's decision is supported by substantial evidence, courts review

23 the administrative record as a whole, weighing both the evidence that supports and detracts from the

24 ALJ's decision.  Sandgathe, 108 F.3d at 980 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th

25 Cir. 1995.)  If the evidence is susceptible to more than one rational interpretation, the Court must

26 uphold the ALJ's conclusion.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  The trier of

27

28 [3] The ALJ did not consider the records from after March 31, 2004, because they were not from the time
when Plaintiff was insured.

**United States District Court**
For the Northern District of California

1    fact, not the reviewing court, must resolve conflicting evidence, and if the evidence can support

2    either outcome, the reviewing court may not substitute its judgment for the judgment of the ALJ.

3    Id.; see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).  An ALJ's decision will not

4    be reversed for harmless error.  Id.; see also Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991).

5          **A.**      **Definition and Determination of Disability**

6          In order to qualify for disability insurance benefits, Plaintiff must demonstrate an "inability to

7    engage in any substantial gainful activity by reason of any medically determinable physical or

8    mental impairment which can be expected to result in death or which has lasted or can be expected

9    to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The SSA

10    utilizes a five-step sequential evaluation process in making a determination of disability.  20 C.F.R.

11    § 404.1520 (2009); see Reddick, 157 F.3d 715, 721.  If the SSA finds that the claimant is either

12    disabled or not disabled at a step, then the SSA makes the determination and does not go on to the

13    next step; if the determination cannot be made, then the SSA moves on to the next step.  20 C.F.R. §

14    404.1520.

15          First, the SSA looks to the claimant's work activity, if any; if the claimant engages in

16    substantial gainful activity, he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i).  Second, the

17    SSA considers whether the claimant suffers from a severe impairment or number of impairments

18    which has lasted or is expected to last twelve months or end in death.  20 C.F.R. §

19    404.1520(a)(4)(ii).  Third, the SSA considers the severity of the impairments; the claimant is

20    disabled if he or she has an impairment that meets or equals one of the listings set forth in 20 C.F.R.,

21    part 404, subpart P, appendix 1, which sets forth impairments whose level of severity conclusively

22    establishes disability, irrespective of vocational factors.  20 C.F.R. § 404.1520(a)(4)(iii).  Fourth, the

23    SSA considers the residual functional capacity ("RFC") and past relevant work; if the claimant can

24    still engage in past relevant work, he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth,

25    the SSA again considers the RFC and age, education, and work experience to see if the claimant is

26    able to make an adjustment to another occupation in the national economy.  20 C.F.R. §

27    404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).

28          **B.  Credibility**

1      In determining whether a claimant's testimony regarding subjective pain or symptoms is

2   credible, the ALJ must engage in a two-step process.  Lingenfelter v. Astrue, 504 F.3d 1028, 1035

3   (9th Cir. 2007).  First, the ALJ must determine whether the claimant has submitted objective medical

4   evidence of the underlying impairment "which could reasonably be expected to produce the pain or

5   other symptoms alleged."  Id. (citing Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991).  Next,

6   if the claimant meets this first test, and there is no evidence of malingering, the ALJ can only reject

7   the claimant's testimony about the severity of his symptoms by offering specific, clear and

8   convincing reasons for doing so.  Id. at 1036 (citing Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir.

9   1996)).  If the ALJ's credibility finding is supported by substantial evidence in the record, the Court

10   may not second-guess the ALJ's finding. Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002); see

11   also Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 600 (9th Cir.

12   1999)

13   **IV.   Final ALJ Decision**

14      In his decision dated February 15, 2008, the ALJ found that Plaintiff was not disabled during

15   the time period in which he was insured.  AR 17.  The ALJ engaged in the five-step analysis,

16   finding: (1) Plaintiff was not engaged in substantial gainful activity from "his alleged onset date of

17   March 31, 1999 through his date last insured," March 31, 2004; (2) during the relevant time frame,

18   Plaintiff had the severe impairments of "chemically induced laryngitis" for two years and "left

19   rotator cuff injury, status post chest trauma with residual pain," but his anxiety and depression only

20   lasted for approximately six months, and therefore was not "severe;" (3) Plaintiff's impairments did

21   not rise to the "level of severity of the Listing of Impairments," noting that Plaintiff's "most severe

22   impairment appears to be his hoarse voice secondary to chemical exposure, however he can still talk

23   and express himself as this impairment has lasted for several years;" (4) Plaintiff cannot perform his

24   past relevant work as a dye maker but had the RFC "to perform light work except that he cannot

25   speak in a loud voice, and he is Spanish speaking and illiterate in English;" and (5) considering

26   Plaintiff's RFC, Plaintiff could perform light work such as working as a small parts assembler or a

27   hand packager.  AR 12-16.  The ALJ therefore concluded that Plaintiff was not disabled, based on

28   the fourth step, that Plaintiff possessed the RFC to perform light work, and the fifth step, that there

1    were a significant number of jobs in the national economy which Plaintiff could perform.  AR 16.

2        In determining that Plaintiff was not disabled, the ALJ agreed with the DDS doctor's medical

3    findings that, prior to Plaintiff's DLI, he retained the RFC to perform light work, noting that

4    Plaintiff's main limitation was his soft and hoarse voice.  AR 15.  While the ALJ found that

5    Plaintiff's "impairments could have been reasonably expected to produce the alleged symptoms,"

6    Plaintiff's allegations of the "intensity, persistence and limiting effects of these symptoms" were not

7    wholly credible.  AR 15.

8        In assessing credibility, the ALJ noted that: (1) the onset and duration of Plaintiff's chest and

9    left shoulder pain was rather vague and his complaints were "quiescent and controllable" under light

10   exertion (defined as "not lifting more than twenty pounds occasionally and ten pounds more

11   frequently with standing and walking no more than six hours per day coupled with occasional

12   bending, stooping, twisting, crouching, crawling, climbing and kneeling"); (2) there was no evidence

13   of adverse medication side effects in the record during the relevant time period or any evidence of

14   "surgery, inpatient care, or emergency room treatment," but rather most of Plaintiff's medical care

15   during the relevant period "was of a routine outpatient nature;" (3) Plaintiff performed daily

16   activities including light household chores ("such as taking the trash out and vacuuming") and

17   driving; (4) Plaintiff's allegations of having to change position every half hour and being limited to

18   lifting only a few pounds, as well as the sedative side effects of his medication, were "generally

19   unsupported prior to his date last insured" by his medical evidence; (5) the current records from Dr.

20   Lin were not from the relevant time period and therefore not relevant to the ALJ's determination;

21   and (6) Plaintiff did not seem to be in distress while testifying at the hearing.  AR 14-15.

22       Since the ALJ found that Plaintiff had the capacity to perform light work, the ALJ asked the

23   testifying vocational expert whether someone with Plaintiff's "age, education, work experience, and

24   residual functional capacity" could find other work, and the vocational expert testified that they

25   could, giving examples from the Dictionary of Occupational Titles ("DOT") of working as a "small

26   parts assembler (DOT 706.684-022) or a "hand packager" (DOT 920.587-018).  AR 16.  These jobs

27   were given as examples; the vocational expert "could have cited more positions" as well, but this

28   was unnecessary for the decision.  AR 16.  The ALJ concluded that Plaintiff could have successfully

United States District Court
For the Northern District of California

9

adjusted to other work existing in "significant numbers" nationwide.  AR 16.

**V.   DISCUSSION**

Plaintiff alleges that he is disabled and unable to work at any exertional level.   Plaintiff alleges that he is severely impaired and suffers from the following symptoms:

> [C]hronic pain, decreased range of motion, postural limitations, manipulative limitations, hoarseness, and the need to frequently change positions. In addition, he only speaks Spanish and is illiterate in English.  He suffers from the severe impairments of left rotator cuff injury, possible left brachial plexopathyl, thoracic strain injury, lumbosacral sprain/strain injury, and laryngitis due to chemical exposure.

Pl.'s Mot. at 1-2.  Plaintiff argues that the ALJ committed five errors in finding him not disabled. These asserted errors are:

    (1)   Failure to develop the record regarding the onset of Plaintiff's disability;

    (2)   Failure to use a medical advisor to establish the onset date;

    (3)   Rejection of Plaintiff's testimony without a legitimate basis;

    (4)   Failure to properly question the vocational expert (VE) and credit the VE's

          testimony regarding a hypothetical which accurately reflected Plaintiff's

          functional limitations; and

    (5)   Identification of jobs by the VE that were inconsistent with the DOT.

These five alleged errors, along with the Commissioner's responses, are addressed below.

**1.   Whether The ALJ Failed To Develop The Record With Respect To The Onset Of Plaintiff's Disability**

**A.   Whether The ALJ Should Have Secured "Missing" Medical Records**

In a Social Security case, "the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel."  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) ("the ALJ has a special duty to fully and fairly develop the record . . ."). This duty is especially important when the claimant is unrepresented.  Higbee v. Sullivan, 975 F.2d 558, 561 (9th Cir. 1992) ("the ALJ is not a mere umpire at [an administrative] proceeding, but has an independent duty to fully develop the record, especially where the claimant is not represented . . .").

10

United States District Court
For the Northern District of California

1   However, it is the Plaintiff's duty to prove that he or she is disabled.  Mayes, 276 F.3d at 459;

2   42 U.S.C. § 423(d)(5) (Supp. 2001) ("An individual shall not be considered to be under a disability

3   unless he furnishes such medical and other evidence of the existence thereof as the Secretary may

4   require").  The ALJ is only obligated to further develop the record if the evidence is ambiguous or

5   the record is inadequate.  Mayes, 276 F.3d at 459-60 ("An ALJ's duty to develop the record further

6   is triggered only when there is ambiguous evidence or when the record is inadequate to allow for

7   proper evaluation of the evidence."); Rodriguez v. Astrue, 2010 WL 3835683, *5 (N.D. Cal. Sept.

8   28, 2010).

9   Plaintiff contends that the ALJ should have secured medical records referenced but not

10  included in the record, citing Smolen, 80 F.3d at 1288 and Higbee, 975 F.2d at 561.  Plaintiff argues

11  that he is Spanish speaking, illiterate, and was unrepresented[4] at the hearing before the ALJ, and the

12  ALJ erred in failing to secure missing records.  Pl.'s Mot. at 13.  For example, Plaintiff cites Dr.

13  Lin's notation of Dr. Holmes' May 2000 report, noting "positive findings of lumbar spine strain with

14  possible left sciatica and chest wall injury of unclear etiology." AR 280.  The report by Dr. Holmes

15  was not in the record.  Plaintiff also argues that the record is missing "two inches" of unspecified

16  medical reports apparently requested but never received by Dr. Lin, and other unspecified "QME,

17  AME, or other Worker's Compensation reports" allegedly not in the record.  Pl.'s Mot. at 13-14.

18  Plaintiff argues that since the ALJ did not procure these additional records on his own, the record

19  was incomplete and Plaintiff's interests were not protected.

20  Defendant counters that "the record was unambiguous and ripe for decision," citing the Ninth

21  Circuit Mayes standard.  Defendant argues that Plaintiff has not explained what additional evidence

22  is needed and why, except for vague references to missing medical records and Dr. Holmes' report.

23  Defendant asserts that Dr. Lin reviewed and summarized Dr. Holmes' report, and the ALJ reviewed

24  the record, including Dr. Lin's report.  Defendant argues that the unambiguous record did not

25  support Plaintiff's alleged impairments.  Further, Defendant argues that Plaintiff's claim that there

26  are additional existing records is speculative, and asserts that speculation is not a sufficient basis for

27

28  _____

[4] The ALJ discussed waiver of representation with Plaintiff at the beginning of the hearing, including asking Plaintiff whether he had consulted with a Spanish-speaking lawyer, and Plaintiff said that he had, but "I think I trust myself more than I trust lawyers."  AR 28-29.

United States District Court
For the Northern District of California

1   remand.  For this position, Defendant cites <u>Key v. Heckler</u>, 754 F.2d 1545, 1550-51 (9th Cir. 1985),

2   which holds that "Section 405(g) expressly provides for remand where new evidence is material and

3   there is good cause for the failure to incorporate the evidence in a prior proceeding."  <u>Id.</u> at 1551.

4   The good cause requirement is satisfied "[i]f new information surfaces after the Secretary's final

5   decision and the claimant could not have obtained that evidence at the time of the administrative

6   proceeding . . . ."  <u>Id.</u>

7        As an initial matter, Plaintiff did not attach any "new evidence" to his brief or request that the

8   record before this Court be supplemented and makes no allegations regarding his own efforts to

9   procure the allegedly missing records, which undermines his claims.  Further, Plaintiff has not

10  shown good cause for his failure to try to obtain or present the allegedly missing medical records.

11  Additionally, Plaintiff has not asserted that these allegedly missing reports contain new or different

12  information which would change the outcome of his case.  If Plaintiff (now represented by counsel)

13  had requested that the record be supplemented and attached the missing medical records to his brief

14  before this Court, the Court could have decided whether the newly submitted evidence would

15  warrant remand.  <u>See</u> Kubitscheck, <u>Social Security Disability Law and Procedure</u>, § 8:9 ("If the

16  claimant has new evidence which is probative of disability, the clamant may seek a remand so that

17  the [SSA] may consider that evidence.  The court may consider the new evidence only to the extent

18  of determining whether the new evidence warrants a remand.")  Since Plaintiff did not attach the

19  missing records, the Court is limited to determining whether the existing record was adequate and

20  unambiguous.

21       With respect to the unspecified missing "medical records," the medical evidence before the

22  ALJ was unambiguous and adequate, and thus no duty to procure additional evidence was triggered.

23  <u>See Mayes</u>, 276 F.3d at 459-60.  The ALJ reviewed an extensive compilation of medical records that

24  adequately support the ALJ's decision that Plaintiff was not disabled as of his DLI.  The missing

25  report by Dr. Holmes, summarized by Dr. Lin as indicating "positive findings of lumbar spine strain

26  with possible left sciatica and chest wall injury of unclear etiology," does not indicate new or

27  different information presenting a basis for a finding of disability.  AR 280.  Rather, it appears to be

28  consistent with the voluminous medical reports already contained in the record, including a May 9,

**United States District Court**
For the Northern District of California

2001 report noting "history of work related back/chest/arm injury." AR 189. Further, Plaintiff has failed to explain how the record was ambiguous. A review of the record shows that most of Plaintiff's assessments were duplicative and repetitive over a number of years. Therefore, the ALJ did not err in failing to secure additional medical records because the record before him was not ambiguous or inadequate.

With respect to Plaintiff's Workers' Compensation ("WC") file, some or all of which was apparently not part of the administrative record, a slightly different but related analysis applies. The ALJ did not address any WC reports in his decision, and did not independently procure them. See AR 10-17. At the hearing, the ALJ stated: "Now, the record shows that you're involved in a Workers' Compensation claim. Have you been receiving temporary Disability Benefits?" AR 34. Plaintiff responded: "It's been five years since last I received any sort of money or medical attention from, from that pain, until I started seeing Dr. Lynn and, and they wanted to cancel that too." AR 34. This is the only mention of Plaintiff's WC claim during the hearing. Plaintiff apparently made WC claims in 2000, 2006 and 2007. The reports titled "Primary Treating Physician's Progress Report" made by Dr. Lin and submitted to WC in 2006 and 2007 appear to be the only WC-related reports in the record. See, e.g., AR 267, 270, 272, 275. Based on Dr. Lin's notation, there was a QME report prepared by Dr. Jeffrey Holmes and dated May 2000 but this report was not in the record. AR 280. Plaintiff argues that the ALJ erred in failing to secure additional WC records.

In a recent decision, McLeod v. Astrue, No. 09-35190, 2010 WL 5132007 (9th Cir. Dec. 16, 2010), the Ninth Circuit held that "when the record suggests a likelihood that there is a VA disability rating, and does not show what it is, the ALJ has a duty to inquire." Id. at *3. However, the present case is distinguishable since an ALJ *must* take the Veteran's Administration's ("VA") disability finding into consideration when reaching his or her decision, see McCartey v. Massenari, 298 F.3d 1072, 1076 (9th Cir. 2002), whereas there is no precedent mandating consideration of a WC file. In McCartney, the Ninth Circuit reversed a district court decision upholding an ALJ's denial of SSA benefits because the ALJ erred in failing to consider a VA finding of disability. The Ninth Circuit noted that nine other circuits agree that a VA disability rating is entitled to evidentiary weight in an SSA hearing, and held that "an ALJ must ordinarily give great weight to a VA determination of

United States District Court
For the Northern District of California

disability" in light of *the marked similarity between these two federal disability programs*." Id.

(emphasis added).  In so holding, the Ninth Circuit distinguished Desrosiers v. Secretary of Health

& Human Svcs., 846 F.2d 573, 576 (9th Cir. 1988), on which the government relied for the position

that an ALJ has no duty to consider medical opinions prepared for other benefit programs.  In

Desrosiers, the court found that the ALJ's reliance on medical evaluations prepared for a California

WC claim was incorrect, because the categories of work under the SSA disability scheme are

"measured quite differently."  Id.  The McCarthy court held that Desrosiers is not pertinent to the

question of how much weight an ALJ should give to another *federal* agency's disability

determination.

These cases indicate a clear distinction between the "great weight" that ALJs should place on

disability determinations by the VA or other federal agencies with disability standards similar to the

SSA standards, versus the relative lack of evidentiary weight given to California state WC

evaluations.  Thus, McLeod v. Astrue does not change the Court's conclusion that the ALJ was not

required to find and consider missing WC reports simply because he was aware that the claimant had

made a WC claim where the record was otherwise clear.

**B.   Whether The ALJ Should Have Explained The "Onset Issue" To Plaintiff**

Plaintiff contends that the ALJ should have explained that he had to prove the onset of

disability before his DLI, March 31, 2004, and specifically asked Plaintiff to "describe his symptoms

and explain why he could not work *prior* to 2004."  Pl.'s Mot. at 14.  Plaintiff argues that the onset

issue was never mentioned at the hearing, even though it was a "critical issue."  Pl.'s Mot. at 14.

Further, Plaintiff alleges that it was clear at the hearing that he did not understand that he had to

prove disability prior to March 31, 2004, as evidenced by his submission of reports from Dr. Lin.

Plaintiff submitted the 2006-2007 reports from Dr. Lin, fully expecting them to support his case, but

the reports were excluded by the ALJ for being over two years past his DLI.  AR 15.

Defendant does not specifically respond to this contention by Plaintiff.  However, Plaintiff

cites no authority requiring the ALJ to explain the onset issue to Plaintiff in the hearing.  Further,

while Plaintiff did submit the post-insured reports from Dr. Lin, Plaintiff also submitted voluminous

medical records from the relevant period of time and described his condition from the relevant

period of time.  For example, the ALJ asked Plaintiff why he stopped working in March of 1999.

AR 35.  The ALJ also asked "Now, your left arm, has it been that way since you stopped working in

March of 1999, or has it gotten worse since then?" and Plaintiff responded "No, I had more mobility

before, but it's been getting worse with time."  AR 35.  While the ALJ did not use the term "onset

date" with Plaintiff, based on the questions that the ALJ asked regarding when Plaintiff stopped

working, Plaintiff had an adequate chance to allege his disability before his DLI.

Additionally, to the extent that Plaintiff is arguing that the ALJ should have explained the

concept of "onset date" because Plaintiff was unrepresented, the ALJ expressly discussed Plaintiff's

right to counsel with Plaintiff at the hearing.  AR 28-29.  The ALJ told Plaintiff that he would not

have to submit payment "up front" in order to secure representation, asked Plaintiff if he had talked

to Spanish-speaking attorneys (which Plaintiff said that he had), and informed Plaintiff of his right

to an attorney and asked him if he wished to waive that right.  AR 29.  Plaintiff waived his right to

counsel after this thorough explanation of waiver.  Additionally, as discussed below, the issue of

onset is only relevant if the ALJ finds the claimant to be disabled, and here the ALJ never found

Plaintiff to be disabled.  Based on a lack of authority supporting Plaintiff's position, the fact that

Plaintiff did get to explain his alleged disability pre-DLI, and that the ALJ never found Plaintiff to

be disabled, the ALJ did not err in failing to specifically explain the "onset issue" to Plaintiff.

### C.   Whether The ALJ Should Have Considered Post-DLI Reports From Dr. Lin

The ALJ found that post-DLI medical reports that Plaintiff submitted from Dr. Lin were

irrelevant to his determination, since they were dated more than two years after Plaintiff's DLI.  See

AR 15 ("the current records from Dr. Eduardo Lin (Exhibit 9F) are not relevant to my determination

as they date from March 2006 to April 2007 more than two years after his insured status expired.

These records indicate an overall worsening of his pain syndrome and functional capacity, but all of

this occurred well after his insured status expired.").

Plaintiff argues that post-DLI medical reports from Dr. Lin support his case, and it was error

for the ALJ not to consider them, because they state that Plaintiff reported symptoms that were

"constant since 1998."  Pl.'s Mot. at 14; AR 306 (March 7, 2006 Report) ("[Plaintiff] reports that his

symptoms have been constant since 1998.  He reports a recent visit to the emergency room at St.

15

Rose Hospital due to worsening pain."). Plaintiff contends that his case requires remand in order to develop the evidence regarding onset in light of this post-DLI evidence. Defendant counters that the ALJ reviewed Dr. Lin's report along with the other medical evidence in the record, and the evidence did not reveal anomalies or support Plaintiff's claimed impairments.

"[M]edical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition." Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988); see also Turner v. Commissioner of Social Sec., 613 F.3d 1217, 1228 -29 (9th Cir. 2010) ("While the ALJ must consider only impairments (and limitations and restrictions therefrom) that [plaintiff] had prior to the DLI, evidence post-dating the DLI is probative of plaintiff's pre-DLI disability."). Based on this Ninth Circuit law, the ALJ would likely have erred had he entirely refused to consider the post-DLI reports submitted by Plaintiff. However, even if he had, the error would have been harmless because the ALJ relied on a significant amount of pre-DLI evidence establishing that Plaintiff was not disabled as of his DLI. Even accepting Plaintiff's self-report to Dr. Lin that his symptoms remained constant or that he visited the emergency room due to worsening pain in 2006 or 2007, Plaintiff has offered no evidence to contradict the ALJ's residual functional capacity determination with respect to the period at issue, ending on March 31, 2004. Because Plaintiff has not demonstrated that he was disabled at that time, any error in failing to consider Dr. Lin's post-DLI reports was harmless. See Willey v. Astrue, 2010 WL 3521786, *2-3 (C.D.Cal. 2010).

In any event, here the ALJ did not refuse to consider the post-DLI reports, but rather reviewed the reports and found them irrelevant in light of the pre-DLI evidence since they were more than two years after Plaintiff's DLI and indicated at most "an overall worsening" of his condition. AR 15. An ALJ may properly discount even retrospective doctor's opinions (not just records of a patient's self-reported symptoms, as here) when they contain no assessment of the plaintiff prior to the DLI. See Lev v. Astrue, 2010 WL 3037261, *6 (N.D. Cal. July 30, 2010) ("The [retrospective opinions] contain no specific assessment of [plaintiff's] functional capacity prior to his DLI. Accordingly, the ALJ's decision to disregard the retrospective opinions was specific and legitimate . . . ."); Johnson v. Shalala, 60 F.3d 1428, 1433 (9th Cir. 1995) (The ALJ properly discounted a physician's

United States District Court
For the Northern District of California

1   retrospective opinion because it contained no specific assessment of claimant's functional capacity

2   prior to the DLI).  Here, the ALJ appears to have properly considered and discounted Dr. Lin's

3   reports based on their lack of specific assessment for the relevant time period.  While Dr. Lin's post-

4   DLI reports mention that Plaintiff self-reported "constant" symptoms since 1998, this was not part of

5   Dr. Lin's assessment of Plaintiff's condition prior to his DLI.  Therefore, the ALJ did not commit

6   reversible error in excluding Dr. Lin's reports from the basis of his determination.

7   **2.    Whether The ALJ Should Have Used The Services Of A Medical Advisor To Establish The Onset Date**

8

9   When the ALJ determines that an individual is disabled, he or she must establish the onset

10   date.  S.S.R. 83-20 ("In addition to determining that an individual is disabled, the decisionmaker

11   must also establish the onset date of disability.").  If the record before the ALJ "is ambiguous as to

12   the onset date of disability, the ALJ must call a medical expert to assist in determining the onset

13   date."  Armstrong v. Comm'r, 160 F.3d 587, 590 (9th Cir. 1998).  In Armstrong, the ALJ found the

14   plaintiff disabled after his DLI, but the onset date was unclear since the plaintiff's symptoms of

15   mental impairment began much earlier than his official diagnosis.  Id. at 589-90.  The ALJ

16   committed reversible error when he inferred the onset date instead of using a medical expert.  Id. at

17   589. However, a medical expert is not required to establish onset if the ALJ does not find the

18   claimant disabled.  Sam v. Astrue, 550 F.3d 808, 809, 810 (9th Cir. 2008) ("SSR 83-20 does not

19   require a medical expert where the ALJ explicitly finds that the claimant has never been disabled");

20   see also Lair-Del Rio v. Comm'r, 2010 WL 2170996, *2 (9th Cir. 2010) ("[A]n ALJ must call a

21   medical expert where the onset date of the disability is unclear.  However, that requirement . . . only

22   applies where a claimant has been found disabled.") (citations omitted).

23   Plaintiff argues that the ALJ should have secured a medical advisor to determine his onset

24   date.  See Armstrong and Delorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that

25   the medical evidence is not definitive concerning the onset date and medical inferences need to be

26   made, SSR 83-20 requires the [ALJ] to call upon the services of a medical advisor . . .").  Plaintiff

27   also cites two cases where the ALJ erred in not seeking a medical expert to establish an onset date

28   where the record was ambiguous or presented some evidence of disability prior to the date last

17

insured.  See Speight v. Apfel, 108 F. Supp. 2d 1087, 1091 (C.D. Cal. 2000) ("[T]he ALJ erred in not seeking testimony from a medical advisor to establish the onset date of [plaintiff's] depression . . . Here, the record shows some, limited evidence that plaintiff suffered from a mental disability prior to [her DLI].");  Quarles v. Barnhart, 178 F. Supp. 2d 1089, 1097 (N.D. Cal. 2001) (Noting ambiguity in the record regarding plaintiff's mental impairments and stating that even though a psychiatric evaluation occurred almost two years after the DLI, that did not establish that the onset did not occur prior to the DLI).

Speight is distinguishable from the present case.  In Speight, the ALJ erred when he acknowledged that, even though he found the plaintiff not disabled prior to her DLI, she was probably psychologically disabled at the time of the hearing and there was evidence of disability onset earlier while she was insured, and yet the ALJ did not seek a medical advisor to establish onset.  See Speight, 108 F. Supp. 2d at 1090 ("the precise date of onset of a disabling psychological impairment may be difficult, or impossible to ascertain, and the services of a specialist may be necessary to infer the onset date").  Similarly, in Quarles, the ALJ erred in failing to establish onset when he noted that the plaintiff was currently suffering from severe impairments, but found her not disabled because there were no psychiatric diagnoses from the relevant time period.  Quarles, 178 F. Supp. 2d  at 1095 ("mental impairments, [] unlike many physical impairments, are progressive in nature and [] onset dates may be elusive").   Both of these courts noted that the onset of psychiatric impairments are particularly difficult to pin down.   Here, by contrast, the plaintiff claims he is physically, not mentally, disabled, and there are voluminous, unambiguous medical records prior to Plaintiff's DLI.  Based on these records, the ALJ found that Plaintiff was not disabled through his DLI, March 31, 2004.  While the ALJ never explicitly stated that Plaintiff was not disabled through the date of the hearing or thereafter, this does not change the Court's analysis.

Defendant also argues that the issue of *when* Plaintiff became disabled is irrelevant since the ALJ never found Plaintiff to be disabled, and therefore a medical expert was never required to establish onset date.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (holding that because the ALJ found the plaintiff not disabled through the date of the decision, "the question of when he became disabled did not arise . . . .").  In Sam, the Ninth Circuit noted that the question of onset date

18

is raised where there is "either an explicit ALJ finding or substantial evidence that the claimant was disabled at some point after the date last insured . . . ." Id.

The present case is not as clear-cut as in Sam, where the ALJ explicitly found the plaintiff not disabled through the date of the hearing, since here the ALJ found the Plaintiff not disabled only through the DLI. The ALJ's notation of Dr. Lin's reports, which indicated a general worsening of Plaintiff's condition and functioning, arguably could support a finding that Plaintiff was disabled after the DLI. Still, this is only weak evidence of a physical disability occurring more than two years later. See AR 15. Further, based on Sam, in order for Plaintiff to rely on Armstrong and Delorme, Plaintiff must point to either an explicit finding by the ALJ of disability or substantial evidence of disability after the DLI. However, Dr. Lin's reports never say that Plaintiff is disabled or unable to work. In fact, Dr. Lin's December 14, 2007 report recommends modality treatment and exercises, in addition to pain medications and acupuncture, in treating Plaintiff's pain. AR 311-312. There is no substantial evidence that Plaintiff was disabled after the DLI, and it would have been reasonable for the ALJ to decide that Plaintiff was not disabled through the date of the decision, although the ALJ never expressly stated this. For the foregoing reasons, the Court finds that the ALJ did not err in failing to utilize a medical expert to establish an onset date.

**3.    Whether The ALJ Rejected Plaintiff's Testimony Regarding His Pain And Functional Limitations Without Articulating Clear And Convincing Reasons For Doing So**

Plaintiff objects to the ALJ's credibility determination that Plaintiff's impairments could have produced the alleged symptoms, but that his statements regarding the intensity and limiting effects of his symptoms were not wholly credible. The ALJ offered the following reasons for discrediting Plaintiff:

> **(1)    The "general nature, onset and duration" of Plaintiff's chest and left shoulder pain was "somewhat vague and non-specific."  AR 14.**

Plaintiff asserts that his medical records document his consistent complaints of pain in his upper left chest and arm, including pain and swelling in his left hand. Pl.'s Mot. at 17. Plaintiff gives a lengthy recitation of his medical records, arguing that his chest and shoulder pain are specifically and clearly documented. Defendant counters that the ALJ correctly found Plaintiff's

complaints of pain to be vague and non-specific.  Defendant characterizes Plaintiff's allegations of "on and off" pain that increased with walking as "erratic."  Def.'s Opp. at 5.  Defendant also notes that Dr. Lin made the observation that the "etiology for [Plaintiff's] left arm and chest wall symptoms was not clear."  AR 307

Plaintiff's report of "off and on" pain that increases with walking does appear to be "erratic."  While Plaintiff has an extensive medical history relating to his chest and left arm pain, there are no records stating that Plaintiff had lost all use of his left arm, as he claimed at the hearing.  Based on the record, it appears that Plaintiff was experiencing pain in his left shoulder and chest, although it is unclear to what degree or how this pain limited his mobility.  In addition, while Plaintiff was injured in June of 1998, he kept working on and off until March 31, 1999, almost a full year after his accident.  Additionally, Dr. Lin noted that the origin of Plaintiff's left arm and chest symptoms were unclear.  Based on these facts, on balance the ALJ did not err in finding that Plaintiff's complaints were vague and non-specific.

> **(2)  If Plaintiff "limits himself to the performance of light exertional activities . . . then generally the level of his subjective complaints are quiescent and controllable."  AR 14.**

Plaintiff argues that he felt that he was re-injuring himself when he lifted more than two or three pounds.  Plaintiff also asserts that he can only sit for half an hour before his back starts to tire, and that he can walk or stand for a little over half an hour, but that he has to keep changing positions. Defendant argues that contrary to Plaintiff's testimony, Dr. Dhaliwal found that Plaintiff could engage in light work, with the limitation of only occasionally reaching overhead with his left arm.  Dr. Dhaliwal "found no handling, fingering or feeling limitations." Def.'s Opp. at 5 (citing AR 15, 230-33, 251).

While Plaintiff testified at the hearing to more severe limitations, the ALJ credited the opinion of Dr. Dhaliwal instead.  Plaintiff's testimony is unsupported by Dr. Dhaliwal, an objective medical examiner.  In addition, Plaintiff has failed to point to any objective evidence in his extensive history of medical examinations that support the degree of his claimed limitations.  See Gallant v. Heckler, 753 F.2d 1450, 1455 (9th Cir. 1984) ("While the ALJ can disregard a claimant's self-serving statements, to do so they must be unsupported by objective findings.")  Here, Plaintiff's self-serving

**United States District Court**
For the Northern District of California

1    statements about his limitations are simply not supported by objective findings by either Dr.

2    Dhaliwal or the record.  Therefore, the ALJ did not err in crediting on Dr. Dhaliwal's opinion that

3    Plaintiff could engage in light work.

4          **(3)  There was no evidence of adverse medication side effects in the record during the relevant time period.**

5

6         Plaintiff argues that he experienced frequent drowsiness after taking medication, which he

7    asserts was an adverse side effect.  Defendant counters that his medical records do not support this

8    claim.  <u>See</u> <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1164 (9th Cir. 2001) (holding that the ALJ did not

9    err in excluding side effects from medication where: "[t]here were passing mentions of the side

10   effects of [Plaintiff's] medication in some of the medical records, but there was no evidence of side

11   effects severe enough to interfere with [Plaintiff's] ability to work."); Def.'s Opp. at 5 (citations

12   omitted).  In <u>Osenbrock</u>, the ALJ specifically asked the plaintiff about his medication side effects,

13   and the plaintiff responded that his symptoms included "'dozing off' and 'dry mouth.'"  <u>Osenbrock</u>,

14   240 F.3d at 1164.  He also stated that he fell asleep while driving.  <u>Id.</u>

15        Here, Plaintiff has cited only one medical record, AR 178, that documents a complaint of

16   "Sleepy, sleepy a lot especially after Prylau."  AR 178 (spelling of medication is unclear).  Plaintiff

17   testified at the hearing that all of his medications made him sleepy, that he sometimes took naps

18   during the day, and that he could only drive when "clear-headed."  AR 37-38.  Out of Plaintiff's

19   voluminous medical records from the relevant time period, there is only one mention of Plaintiff

20   being sleepy after taking one medication.  AR 178.  Therefore, the ALJ did not err in finding no

21   evidence of adverse medication side effects in Plaintiff's medical record during the relevant time

22   period.

23         **(4)  There was no evidence of "surgery, inpatient care, or emergency room treatment."  AR 14.**

24

25        Plaintiff argues that he visited the emergency room on April 14, 2000 for pain in his throat.

26   Defendant counters that Plaintiff essentially received routine outpatient treatment.  As noted above,

27   it does not appear that Plaintiff received any treatment at this visit, consistent with the ALJ's finding

28   that Plaintiff has never received any emergency room *treatment*.  Therefore, the ALJ did not err in

1    finding that Plaintiff had never had surgery, inpatient care, or emergency room treatment, and that

2    this lack undermined Plaintiff's credibility in describing the severity of his pain.

3         **(5)  Most of Plaintiff's medical care during the relevant period "was of a routine
              outpatient nature."  AR 14.**

4

5         Plaintiff argues that his treatment was undermined by his lack of medical insurance and

6    inability to pay for treatment.  Plaintiff argues that as one example, in 2001 he was unable to obtain

7    an MRI due to his financial problems.  AR 183.  The record shows that in 2003, Plaintiff did not

8    have any health insurance.  AR 178.  Plaintiff argues that he "should not be penalized for his lack of

9    funds or medical insurance."  See Carmickle v. Commissioner, 533 F.3d 1155, 1162 (9th Cir. 2007)

10   (stating that "although a conservative course of treatment can undermine allegations of debilitating

11   pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a

12   good reason for not seeking more aggressive treatment").

13        Defendant counters that Plaintiff received outpatient treatment consisting of effective pain

14   medication and that there is no indication that Plaintiff required more aggressive treatment.

15   Defendant relies on Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999), which held that the ALJ

16   did not err in discrediting plaintiff's testimony regarding high-level pain where there was no

17   prescription for or request by plaintiff for any serious medical treatment.  Id. ("[Plaintiff's] claim

18   that she experienced pain approaching the highest level imaginable was inconsistent with the

19   'minimal, conservative treatment' that she received.") (citation omitted).

20        While minimal treatment can be a proper basis for discrediting Plaintiff, given Plaintiff's

21   financial limitations, minimal treatment may not have been a proper basis here.  However, Plaintiff

22   points to only one instance of his medical insurance status limiting his ability to obtain additional

23   treatment, and this is only one factor among many that the ALJ considered in discrediting Plaintiff's

24   testimony and several of the ALJ's other reasons were supported by the evidence.  Thus, at most it

25   was harmless error and does not warrant remand or reversal.

26        **(6)  Plaintiff performs daily activities including light household chores "such as
              taking the trash out and vacuuming," and "is able to drive if he has to do so."
              AR 14.**

27

28        Plaintiff argues that the ALJ mischaracterized his testimony, painting an overactive picture of

his life.  Plaintiff re-asserts his testimony that he spends all day changing positions and sometimes napping to deal with sleepiness from medication.  Plaintiff also asserts that he prepares his own food, performs chores if able to do so, and only drives if feeling clear-headed.  Further, Plaintiff argues that even if he did occasionally engage in household chores or drive a car, this does not prove that he can work full time.  See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (stating that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir. 1987) (stating that disability claimants are not required to "vegetate in a dark room" in order to be eligible for benefits).  The Ninth Circuit has held that with respect to home activities, "[o]nly if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility." Reddick, 157 F.3d at 722.

Defendant does not respond to this argument. The Ninth Circuit test is whether or not the level of activity is inconsistent with Plaintiff's claimed limitations. Id.  Plaintiff claims that he cannot work at all, yet the ALJ found Plaintiff's self-reported activities around his home such as cleaning and driving to be evidence undermining his credibility and that he could engage in light work. Plaintiff's main point seems to be that he cannot engage in light work consistently; he points out that he takes naps, and only works around his home or drives as he is able.  Some light work around the house and occasional driving are not necessarily inconsistent with Plaintiff's alleged limitations of complete non-use of his left arm, a right arm that tires quickly, being limited to lifting a few pounds, and having to frequently change positions.  Given that Plaintiff is not required to "vegetate in a dark room," Plaintiff's occasional work around his home and driving are not clear and convincing reasons undermining his credibility, and thus the ALJ erred in relying on this as a basis for undermining Plaintiff's credibility.  Cooper, 815 F.2d at 561.  However, as above, this error does not warrant a remand or reversal because most of the ALJ's other reasons for discrediting Plaintiff were supported by substantial evidence for the reasons discussed herein.

> **(7)  Plaintiff's allegations of having to change position every half hour and being limited to lifting only a few pounds, as well as the sedative side effects of his medication were "generally unsupported prior to his date last insured" by his medical evidence.  AR 14.**

1    Plaintiff argues that the ALJ was incorrect, and that on March 19, 2003, Plaintiff reported

2    being sleepy after taking medication.  TR 178.  While Plaintiff argues with the ALJ's finding

3    regarding the sedative side effects of his medication, Plaintiff does not take issue with the ALJ's

4    findings that his allegations of having to change his position every half hour and his limitation of

5    only being able to lift a few pounds were generally unsupported by the medical evidence.  Plaintiff's

6    reliance on one medical record does not tend to show that all of his medications make him sleepy.

7    Further, it is uncontested that Plaintiff's allegations about having to change positions and his lifting

8    limitations are generally unsupported by the record.  Therefore, the ALJ did not err in finding that

9    Plaintiff's alleged limitations were generally unsupported by the record.

10           **(8)  Plaintiff did not seem to be in distress while testifying at the hearing.**

11    Plaintiff argues that he was seated for the entire hearing, which was short, and that his ability

12    to walk and stand were only shown for a few minutes when he entered and exited the room.  Plaintiff

13    argues that he can walk/stand for approximately half an hour before having to change positions, and

14    therefore the ALJ did not have a chance to observe Plaintiff's need to change positions after

15    standing or walking.  Further, Plaintiff argues that the ALJ's observations at the hearing are not

16    indicative of his ability to work all day on a daily basis.  Pl.'s Mot. at 21.  Plaintiff argues that the

17    ALJ is incorrectly relying on "sit and squirm" jurisprudence.  See Perminter v. Heckler, 765 F.2d

18    870, 872 (9th Cir. 1985) ("The ALJ's reliance on his personal observations of [plaintiff] at the

19    hearing has been condemned as 'sit and squirm' jurisprudence.")  In Perminter, the Ninth Circuit

20    held that the ALJ should not deny a claimant benefits based on the ALJ's observations of the

21    claimant at the hearing, as long as the claimant's statements were objectively supported.  Id.

22    ("Denial of benefits cannot be based on the ALJ's observation of [plaintiff], when [plaintiff's]

23    statements to the contrary, as here, are supported by objective evidence.")

24    Defendant argues that the ALJ properly observed only as one factor that Plaintiff appeared to

25    be fine at the hearing, and did not keep changing positions.  Defendant relies on Fair v. Bowen, 885

26    F.2d 597, 602 (9th Cir. 1989) which provides that: "That a claimant does not exhibit manifestations

27    of pain at the hearing before the ALJ is, standing alone, insufficient to rebut a claim of pain.".  Fair

28    cites Gallant v. Heckler, 753 F.2d 1450, 1455 (9th Cir. 1984), where as one factor, the ALJ rejected

**United States District Court**
For the Northern District of California

medical evidence and the plaintiff's complaints of pain based on the plaintiff's demeanor at the hearing. <u>Id.</u> The ALJ noted that the plaintiff sat for over an hour without appearing to be in distress. <u>Id.</u> The Ninth Circuit stated that "[t]he fact that a claimant does not exhibit physical manifestations of prolonged pain at the hearing provides little, if any, support for the ALJ's ultimate conclusion that the claimant is not disabled or that his allegations of constant pain are not credible." <u>Id.</u>

Based on these cases, the ALJ may have erred in relying on his personal observations at the hearing. However, the Ninth Circuit has also held that reliance on "sit and squirm" evidence, on its own, does not warrant remand. <u>See</u> <u>Verduzco v. Apfel</u>, 188 F.3d 1087, 1090 (9th Cir. 1999) ("Although this Court has disapproved of so-called 'sit and squirm' jurisprudence, <u>Perminter v. Heckler</u>, 765 F.2d 870, 872 (9th Cir.1985), the inclusion of the ALJ's personal observations does not render the decision improper.") (internal quotations and citation omitted). Therefore, while the ALJ's observations of Plaintiff provide little or no support for discrediting his testimony, it was not reversible error for the ALJ to make personal observations at the hearing.

In conclusion, Plaintiff argues that none of the eight reasons that the ALJ gave for discrediting his testimony are clear and convincing, and he would have been deemed disabled if the ALJ had credited his testimony. Defendant counters that the ALJ "gave valid reasons based on substantial evidence and free of legal error for discrediting Plaintiff's allegations of disabling symptoms and limitations" and the ALJ's findings should be affirmed. For the reasons discussed above, at least five of the reasons are supported by specific findings and are sufficient, even ignoring the other three reasons, to undermine Plaintiff's credibility. Thus, the ALJ properly rejected Plaintiff's testimony regarding his symptoms and limitations that were unsupported by medical evidence.

> **4.    Whether The ALJ Failed To Properly Question The VE And Failed To Properly Credit His Testimony In Response To Questions Which Accurately Reflected Plaintiff's Functional Limitations (Step Four)**

Plaintiff argues that a claimant's RFC must be based upon the whole record, including Plaintiff's testimony. <u>See</u> <u>Robbins</u>, 466 F.3d at 883 ("In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, inter alia, medical records, lay evidence, and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.") (internal quotations and citation omitted). In <u>Robbins</u>, the Ninth Circuit

**United States District Court**
For the Northern District of California

1   stated that careful consideration should be given to subjective descriptions of symptoms, which may

2   indicate more severe restrictions than the medical evidence indicates.  Id.

3       Plaintiff primarily contends that the ALJ erred by completely ignoring Dr. Dhaliwal's "opinion

4   that Mr. Meza was limited to occasional handling, fingering, and feeling with his left upper

5   extremity."  Pl.'s Mot. at 23 (no citation to record provided).  Citing the record at AR 232, Plaintiff

6   argues that this limitation should have been included in the hypothetical presented to the VE.

7   However, the Court has not located any opinion by Dr. Dhaliwal stating that Plaintiff was limited to

8   "occasional" handling, fingering and feeling with his left side.  To the contrary, AR 232 shows that

9   Dr. Dhaliwal found that Plaintiff could engage in " unlimited" handling, fingering and feeling, with

10  the only limitation being that he could only occasionally reach overhead with his left arm.  A typed

11  note below states "Left Upper [extend] overhead to [occasionally]."  AR 232.

12      Plaintiff also argues that the ALJ erred in rejecting his testimony regarding his pain and the

13  loss of use in his left arm, and failing to incorporate these limitations into the hypothetical relied

14  upon, which was "an individual, the same age, education and work history as the claimant.  In that

15  regard they're Spanish-speaking and illiterate in English.  Exertionally they're limited to light work,

16  and the initial non-exertional limitation would be that, it's hard [to] quantify, but he cannot speak

17  loudly."  AR 40; See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988) ("Hypothetical questions

18  posed to the vocational expert must set out all the limitations and restrictions of the particular

19  claimant, including, for example, pain and an inability to lift certain weights.").

20      In Embrey, the ALJ erred in posing a hypothetical that did not include Plaintiff's claimed

21  limitations, which the ALJ had improperly discounted without giving specific, legitimate reasons for

22  doing so.  Id. at 423.  For example, one of the limitations that the ALJ improperly omitted in Embrey

23  was the plaintiff's need to rest periodically.  Id.  Here, Plaintiff's credibility has already been

24  addressed above, and Plaintiff does not point to anything stating that he could only occasionally

25  handle, finger and feel with his left side, or any medical record stating that Plaintiff had lost the use

26  of his left arm.  Unlike Embrey, here the ALJ had specific, legitimate reasons for discrediting

27  Plaintiff's testimony and not including his claimed limitations in the first hypothetical on which the

28  ALJ relied.

United States District Court
For the Northern District of California

1    The ALJ also gave the VE a second hypothetical in which the individual had "lost the use of

2    the non-dominant left hand," and asked the VE if that would change Plaintiff's ability to engage in

3    light work.  AR 41.  The VE testified that there were no jobs that such an individual could perform:

4    "without use of the non-dominant arm, with the Spanish-speaking, illiterate, only able to speak

5    conversationally and not loud, I do not believe there are, Your Honor."  AR 42.  However, the ALJ

6    did not find that Plaintiff had lost the use of the non-dominant left hand, and therefore did not rely

7    on that second hypothetical.  The ALJ was correct in relying on the VE's testimony and finding

8    Plaintiff not disabled after giving a hypothetical that reflected all of the limitations that Plaintiff was

9    found to have.  See Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) ("If a vocational expert's

10   hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no

11   evidentiary value to support a finding that the claimant can perform jobs in the national economy.")

12   (internal quotations and citation omitted).

13   **5.    Whether The Jobs Identified By The Vocational Expert Based On The ALJ's
         Hypothetical Were Consistent With The DOT (Step Five)**

14

15           **A.    Whether The ALJ Failed To Properly Question The VE About Whether His
             Testimony Was Consistent With The DOT**

16   Plaintiff argues that the ALJ failed to ask the VE whether his testimony was consistent with the

17   DOT, even though the ALJ stated that it was consistent in his decision.  AR 16.  Plaintiff argues that

18   the Ninth Circuit requires an ALJ to ask the VE if his testimony conflicts with the DOT, and that

19   failure to do so requires remand.  In Masachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007), the

20   Ninth Circuit held that an ALJ may not "rely on a vocational expert's testimony regarding the

21   requirements of a particular job without first inquiring whether the testimony conflicts with the

22   Dictionary of Occupational Titles."  Id.  Plaintiff argues that at a minimum, remand is required on

23   this basis.

24   Defendant does not respond to this argument, other than to argue that the ALJ properly relied

25   on the VE's testimony.  While Plaintiff is correct regarding the requirement that ALJ ask the VE

26   whether his or her testimony is consistent with the DOT, violation of this procedural requirement

27   can be harmless error.  See Massachi, 486 F.3d at 1154, n. 19 ("This procedural error could have

28   been harmless, were there no conflict, or if the vocational expert had provided sufficient support for

her conclusion so as to justify any potential conflicts . . . .")  For example, it is harmless error when the plaintiff fails to identify an actual inconsistency between the VE's testimony and the DOT, and there is no apparent inconsistency.  In Cordray v. Astrue, 2010 WL 2608331, *9 (D. Or. Mar. 3, 2010) the court noted that the VE's failure to inquire was harmful in Massachi, because in that case there was "an apparent conflict with no basis for the vocational expert's deviation."  Id.  In Cordray, however, the plaintiff was unable to identify an inconsistency between the VE's testimony and the DOT, and the court found no apparent inconsistency.  Id.  Therefore, the court found that the ALJ's failure to inquire was harmless.  Id.

Similar to Cordray, Plaintiff here has failed to identify an actual inconsistency and there is no apparent inconsistency between the VE's testimony and the DOT.  Therefore, the ALJ's failure to ask the VE whether his testimony was consistent with the DOT is harmless error.  While Plaintiff does allege an inconsistency, as discussed below, it is not a true inconsistency.

**B.    Whether A Spanish Speaking And Illiterate Person Is Capable Of Reasoning Level Two Under The DOT**

The DOT is a primary tool for making determinations about work in the national economy.  See Policy Interpretation Ruling SSR 00-4p ("In making disability determinations, we rely primarily on the DOT . . . for information about the requirements of work in the national economy . . . We may also use VEs and VSs at these steps to resolve complex vocational issues.")

Plaintiff argues that the hypothetical person specified by the ALJ[5], one who speaks Spanish and is illiterate, is incapable of functioning as either a small parts assembler or hand packager because these jobs require "reasoning level two," which means the ability to: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations."  DOT, Appendix C: Components of the Definition Trailer; Pl.'s Mot. at 25.  Plaintiff asserts that the ALJ's hypothetical person is incapable of reading English instructions or understanding oral directions in English.

---

[5] The ALJ gave the following hypothetical: "assume that we have an individual, the same age, education and work history as the claimant.  In that regard they're Spanish-speaking and illiterate in English. Exertionally they're limited to light work, and the initial non-exertional limitation would be that, it's hard [to] quantify, but he cannot speak loudly."  AR 40.

United States District Court
For the Northern District of California

1  Plaintiff argues that in spite of this alleged inconsistency, the VE stated that an illiterate, Spanish

2  speaking person could work as a small parts assembler or hand packager. Other than citing the DOT

3  job descriptions, Plaintiff cites no legal authority for this argument.

4  Defendant counters that the ALJ correctly relied on the VE's testimony that a person with

5  Plaintiff's capacity could work as a small parts assembler or hand packager, noting that such jobs

6  were representative of the types of work Plaintiff can perform. Def.'s Opp. at 6. The ALJ

7  specifically asked the VE: "Now, would there be any unskilled jobs that could be performed within

8  [the hypothetical given] . . . it's very basic one and two-step jobs, sometimes called point and

9  perform, where you just show how to do the work by a short demonstration. Would there be any

10  jobs like that?" AR 40. The VE responded that there were such jobs, and as examples provided the

11  jobs of hand packager and small products assembler. AR 41.

12  Defendant also argues that Plaintiff is incorrect in asserting that illiteracy renders him unable

13  to work in jobs requiring reasoning level two. Defendant points out that illiteracy is addressed as a

14  separate variable, language level, whereas reasoning level actually "involves the ability to apply

15  common sense to solve problems of increasing difficulty," citing the hand packager job description

16  DOT No. 920.587-018. Def.'s Opp. at 6. Defendant is correct that illiteracy is addressed under

17  language level.[6] In Lawson v. Apfel, 46 F. Supp. 2d 941, 945, 947 (W.D. Mo. 1998), the court

18  addressed literacy and language level, noting that all jobs contained in the DOT contain a language

19  development level, with level 1 being the lowest level used. The court noted that: "A decision

20  holding that illiterate individuals could not perform Level 1 jobs would mean that illiteracy was a

21  per se disability under the DOT. Illiterate people would not qualify to work any job listed in the

22  DOT." Id. The court found such a result to be illogical and in direct contradiction to Social

23  Security regulations, noting that: "The regulations indicate that [plaintiff] is not disabled simply

24  because she is functionally illiterate. 20 CFR pt. 404, subpt. P, app. 2 § 202.16 (stating that a

25  younger individual, who is illiterate or unable to communicate in English, and who is unskilled or

26  has no prior work experience is not disabled)." Id. The court upheld the ALJ's decision that a

---

27

28  [6] Illiteracy is also addressed under the education factor. See 20 C.F.R. § 404.1564(b)(1) (stating in part that: "Illiteracy means the inability to read or write" and generally means that the person "has had little or no formal schooling.")

29

United States District Court
For the Northern District of California

1     functionally illiterate plaintiff could perform "such jobs as photo finisher, hand packer, and laundry

2     folder," which require Level 1 Language Development. Id.; see also Priel v. Astrue, 2010 WL

3     184329, *3 (W.D.N.Y. Jan. 15, 2010) ("The Social Security Regulations indicate that a claimant is

4     not disabled simply because he is functionally illiterate.") (citations omitted). In this case, both the

5     job of small products assembler and hand packager have a language level of one. Therefore,

6     illiteracy is not inconsistent with the jobs that the VE testified that Plaintiff could perform.

7          Plaintiff further argues that a Spanish speaking person is incapable of understanding English

8     oral instructions. However, the ALJ's hypothetical and the VE's testimony expressly accounted for

9     this limitation. The ALJ specifically asked the VE: "Now, would there be any unskilled jobs that

10    could be performed within [the hypothetical given] . . . it's very basic one and two-step jobs,

11    sometimes called point and perform, where you just show how to do the work by a short

12    demonstration. Would there be any jobs like that?" AR 40. The VE testified that there were such

13    jobs, giving the examples of hand packager and small parts assembler. According to the VE,

14    Plaintiff could perform these very basic jobs, where someone else could give a short demonstration,

15    and Plaintiff could carry out the job. Further, Plaintiff cites no authority that a non-English speaking

16    person is automatically disabled. Therefore, the jobs identified by the VE were not inconsistent with

17    the DOT.

18   **VI.   CONCLUSION**

19          In conclusion, the ALJ's decision that Plaintiff was not disabled is supported by substantial

20    evidence. While some of the reasons that the ALJ gave for discrediting Plaintiff were not clear and

21    convincing, the ALJ relied on five other clear and convincing reasons for discrediting Plaintiff.

22    Plaintiff's motion for summary judgment is DENIED and Defendant's cross-motion for summary

23    judgment is GRANTED.

24    **IT IS SO ORDERED.**

25    Dated: January _4_, 2011

26                              ELIZABETH D. LAPORTE
                                United States Magistrate Judge

27

28

30